**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| JONATHAN BENCHIK, | ) | |
|       Plaintiff, | ) | |
| | ) | |
|    v. | ) | CAUSE NO.: 2:19-CV-437-JPK |
| | ) | |
| INDIANA FAMILY AND SOCIAL | ) | |
| SERVICES ADMINISTRATION and | ) | |
| JENNIFER SULLIVAN, | ) | |
|       Defendants. | ) | |

**OPINION AND ORDER**

This matter is before the Court on Defendants' motion for summary judgment [DE 49]. Defendants Jennifer Sullivan and the Indiana Family and Social Services Administration ("IFSSA") seek dismissal of Plaintiff Jonathan Benchik's claims that he was subjected to a hostile work environment based on his sex, and retaliated against for complaining about it. While Benchik has presented evidence that he was subjected to a hostile work environment, he has not shown that Defendants retaliated against him, or that this was the reason for his termination. Accordingly, Defendants' motion is granted in part and denied in part.

**A.      STANDARD OF REVIEW**

The Federal Rules of Civil Procedure require the entry of summary judgment against a party "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. In other words, the record must reveal that no reasonable jury could find for the non-movant. *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations omitted). A court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences in favor of that party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Srail v. Vill. of*

*Lisle*, 588 F.3d 940, 948 (7th Cir. 2009). A court's role is not to evaluate the weight of the evidence, judge witness credibility, or determine the truth of the matter, but to determine whether there is a genuine issue of triable fact. *Liberty Lobby*, 477 U.S. at 249-50.

## B.    FACTUAL BACKGROUND

The Court describes the facts in the light most favorable to Benchik, the non-movant. On September 25, 2017, Benchik, a 60-year-old man, began work as a State Eligibility Consultant ("SEC") for the IFSSA. Benchik's job was essentially to interview applicants for the Supplemental Nutritional Assistance Program, Medicaid, and Temporary Assistance for Needy Families, to determine if they were eligible for those programs. [*See* Def. Ex. A-1]. Benchik had been led to believe that he would work in the Hammond office. However, on his first day of work he was told he would be temporarily stationed in the Crown Point office due to space considerations. [Def. Ex. A, Deposition of Jonathan Benchik, 14:22-17:4].

### 1.   Crown Point bathrooms

The Crown Point office had approximately 35 to 45 employees on site, all of whom were women except for Benchik and Regional Manager Arthur McLeod, who was only in the office once a month. The office had one men's bathroom and one women's bathroom for employees, and one men's room and one women's room in the lobby, available to the public. With no male employees on site, the women had occasionally used both employee bathrooms. On his first day, Benchik was approached by a manager, Kimberly Thompson, who said: "[S]ince you're here, there's like 40 women that have to share a bathroom. See that bathroom over there? . . . You get that all to yourself, and we all have to share." There was a reversible sign on the door of the employee men's room that read "Male on premises," which was used to remind employees when a male employee was in the office. [*Id*. 17:22-21:6].

During his time in Crown Point, Thompson would walk past Benchik's desk every day, sometimes multiple times a day, and tell Benchik "I'm going to be using your bathroom now," and sometimes that she was going to urinate or defecate. Benchik felt that Thompson was "trying to make things difficult" for him. He did not report this issue to anyone until he confronted Thompson at the end of his six-month probationary period. [*Id*. 21:14-24:13, 40:21-42:16].

On one occasion, Benchik was in the employee men's room washing his hands, and Thompson came in and said "Oh, you're in here. This would be a good place -- or this is how rapes happen." Benchik responded: "There's not going to be any rapes in here," and left the restroom. Eventually, Benchik "quit using" the employee restroom and began using the public restroom. He would frequently have to stock the public restroom with his own soap and paper towels, because the public would steal them. Benchik did not report Thompson's remark or the fact that he was using the public restrooms to anyone. [*Id*. 45:6-47:4].

### 2.   Crown Point training and discipline

Every new IFSSA full-time employee begins with a six-month "working test period," during which they should receive a performance appraisal. The purpose of the test period is to determine whether the employee's "abilities have been satisfactory and whether the appointing authority will continue [the] appointment." If the employee successfully completes the test period, he or she gains the right to due process prior to any suspension or termination. If the employee's performance is not satisfactory, the employee could have the test period extended or could be fired. [*See* Def. Ex. D at 43].

In his second week on the job, Benchik began training for his position, which primarily involved watching live video lectures by a trainer in a remote location, while reviewing the trainer's presentation slides and other training materials. The training happened in sessions of

three to four weeks over roughly six months. [*Id*. 33:23-36:7]. Benchik also watched other Crown Point employees conduct eligibility interviews. [*Id*. 69:15-24]. On October 30, 2017, he told a supervisor that he was "really having problems with training" because the remote instructor was not presenting the material clearly and would not answer questions promptly. [Def. Ex. J]. On November 11, 2017, as part of an office-wide "staff realignment," Thompson, who made the alleged bathroom remarks, became Benchik's supervisor. [Def. Ex. I].

On December 12, 2017, Benchik was asked to add a birth record into a client's file, and looked up the birth date on Facebook, which was prohibited. The incident was reported to Regional Manager McLeod, who ordered the Crown Point managers to reemphasize the office rules against using Facebook for client information, and using their personal cell phones during work time, and to "reduce the communication to writing" with Benchik. Thompson gave Benchik two "written counselings": one for researching a client's date of birth using social media, and one for using his personal cell phone during working hours. [Def. Exs. A-6, A-7, G, Benchik Dep. 84:19-85:15]. According to Benchik, "[n]o one else [got] written up for something like that" during their training period. [Def. Ex. A at 82:19-84:2]. Generally, "it would have to be something very bad," like blatant insubordination, for an employee to receive a written counseling during their training period. Discipline would more typically start with coaching or a verbal warning. [Pl. Ex. 2, Deposition of Elizabeth Olivarri, 19:4-9; Pl. Ex. 3, Deposition of Lanetta Inman, 15:16-25; Pl. Ex. 4, Testimony of Kimberly Thompson, ¶¶ 11-12]. Written counselings were typically given as "extra chances" for employees who would otherwise have been fired. [Def. Ex. B, Deposition of Caitlin Floyd, 68:6-21, 76:4-77:12].

On January 26, 2018, Benchik was disciplined when he asked the remote trainer a question and then wrote in the chat box, "Please can you help me with this question? Time is

precious," because the trainer had been slow to answer his questions.[1] [Benchik Dep. 86:18-88:8]. He received a third written counseling: "Jonathan was informed by his trainer to contact her when he gets frustrated instead of making inappropriate comments in the chat box window. Jonathan did not follow instructions received from the trainer and instead made an inappropriate comment in the chat box window." [Def. Ex. A-8].

### 3. Extensions of working test period

On March 25, 2018, Benchik's six-month anniversary, his working test period expired. The next day, he confronted Thompson about her bathroom remarks: "Kim, you've got to stop this. You can't keep asking me about the bathroom, it's illegal. You can't do this." Thompson replied: "Okay." [Benchik Dep. 48:3-10]. About 20 minutes later[2], Thompson e-mailed McLeod "requesting an additional 90 days" for the working test periods of Benchik and one other employee. Attached to that e-mail was a working test appraisal, which indicated that Benchik "[met] expectations" in four out of six competencies. He "[did] not meet expectations" in "job knowledge" and "problem solving/decision making."[3] [Pl. Ex. 5].

McLeod asked Thompson to "provide detail for all competencies and explain your rating." *Id.* On April 5, Thompson provided a revised appraisal, which indicated "[m]eets expectations" in three competencies, and "needs improvement" in the other three. In addition to the comments in the previous appraisal, Thompson wrote that Benchik "does not work well

---

[1] In Benchik's response to Defendants' statement of material facts, he states that this fact is "disputed," but does not explain the dispute or provide a citation to contrary evidence. [DE 58, ¶ 80].

[2] Benchik testified: "And it was later that day, she told me that she was extending my working test period. And I saw by the . . . internal documents, that [Thompson] extended my working test period in about 20 minutes. She corresponded with McLeod. And so that's how I knew it was retaliation." [Benchik Dep. 48:12-16].

[3] As to job knowledge, Thompson wrote: "Jonathan does not possess adequate SEC job knowledge due to only completing ES training recently. He does not possess the skills and experience to perform his SEC duties successfully. He has just completed ES training and has no experience as a State Eligibility Consultant." As to problem solving/decision making, Thompson wrote: "At this time Jonathan does not have adequate problem solving and decision making skills. He needs assistance on an everyday basis in regards to problem solving and decision making for case processes." [Pl. Ex. 5].

under pressure. It takes time for Jonathan to adapt to changes in the workplace. He often gets frustrated if there is something he does not understand right away." He was given an overall rating of "needs improvement," with a request to extend the working test period for 60 days. [Def. Ex. E]. It was "common" for SECs to have their six-month working test period extended, because the training was complicated and takes 22 weeks to complete, and the managers do not get a good picture of the employee's capabilities. [Def. Ex. N, Deposition of Sunshine Beam, 49:20-50:9]. Benchik's working test period was extended through June 20, 2018.

On May 11, 2018, Thompson e-mailed Arthur McLeod indicating that Benchik had asked to meet with human resources because he believed Thompson was trying to "shipwreck" him. Thompson alleged that Benchik had come to her office door "very flustered" about a work e-mail she had sent him. Thompson said that during this exchange, she was "in fear because [Benchik] was standing up and was visibly turning red and [raising] his voice." Two other employees told Thompson that Benchik was planning to accuse her of sexual harassment. Thompson asked for Benchik to be reassigned to another supervisor. [Def Ex. B-1].

About two hours later, Benchik met with McLeod alone for about an hour. Benchik told McLeod "everything," including the bathroom issues, his issues with the lack of training and mentorship, and his belief that Thompson was retaliating against him. However, by this time, Thompson had stopped making remarks about the bathroom. McLeod promised that Benchik would be given a mentor, and told Benchik: "Thompson's never going to hassle you about bathrooms again." [Benchik Dep. 78:12-80:2].

On May 14, 2018, McLeod told Thompson: "We have not substantiated that either you harassed [Benchik] or that he claimed you harassed him . . . Continue to develop and work with [Benchik] as usual." Thompson agreed with this approach. [Def. Ex. A-5]. However, on May 17,

2018, McLeod told Thompson that Benchik was being relocated to Hammond and would be given a new supervisor. [Def. Ex. F]. Thompson was relieved of her supervisory duties in the "third week of May," and Benchik was relocated to Hammond in early June. [Benchik Dep. 111:21-112:4].

On June 25, 2018, Benchik received a revised appraisal for the extended working test period. Although Tabitha Former had taken over as manager earlier that month, the appraisal was completed by Thompson, who had supervised him for most of the relevant period. The ratings on this appraisal were the worst of any so far. Benchik was marked as "needs improvement" in four areas, with an overall grade of "needs improvement." Former delivered Thompson's appraisal to Benchik, but told him "[D]on't worry about this, this isn't important . . . you're doing fine here." [Benchik Dep. 110:14-111:9]. The appraisal requested that Benchik's working test period be extended to September 6, 2018.[4] [Def. Ex. A-9].

In Hammond, Plaintiff's 1-hour lunch break began at 11:00 each day, but his last interview of the morning would frequently spill into the lunch period. Former told him: "Jonathan, please don't shorten your lunches. It's illegal for us to allow you to do so. You're entitled to an hour. You will get faster, but just make sure you're taking control of all calls . . . [I]nterviews should be no longer than 45 minutes." [Def. Ex. A-3]. However, his managers would frequently schedule interviews to start between 10:30 and 11:00 am, which cut into his lunch break. Although it was common for employees' scheduled interviews to cut into their lunch break [Pl. Ex. 16], other employees were generally not warned about late lunches. [Benchik Dep. 55:3-58:13; Inman Dep. 27:7-30:19].

---

[4] Although the appraisal "requested" this further extension of the working test period, no party designated any facts clearly establishing that Benchik's working period was extended through September 6, 2018.

Benchik was occasionally assigned Supplemental Nutrition Assistance Program ("SNAP") cases. In SNAP cases, the employees had to decide whether to authorize benefits, as opposed to merely interviewing clients. Benchik was told he was not allowed to authorize benefits on his own, and should send his cases to his manager, Former, for review. However, on multiple occasions, he forgot to send the cases for review, because there were so many tasks being assigned. [Benchik Dep. 116:8-118:5]. On August 7, 2018, Former reminded him to send her all SNAP cases: "You're actually hindering yourself from advancing [because] I haven't been able to check anything SNAP related." [Def. Ex. A-10 at 6-7]. The following day, Benchik sent Former a summary of a SNAP case which showed that Benchik had authorized benefits on his own for that case. [*Id*. at 1-2]. Former sent Benchik another e-mail repeating the policy for SNAP cases, warning that "if you fail to follow these instructions in the future it may result in further disciplinary actions." [Def. Ex. O].

### 4.  Client complaint and termination

On August 28, 2022, Benchik had an argument with a client that resulted in a complaint against him. A 22-year-old client reported to Benchik that she was homeless, but Benchik discovered that the client's mother and aunt both had utility bills in the client's name. The client's mother initially stated that the client lived with her, but then said that the client was homeless. Benchik asked the mother: "[T]his is three different answers . . . [y]ou're saying she lives with you, but then she was living with her aunt. So how can she be homeless?" [Benchik Dep. 130:1-132:18]. The mother made a complaint indicating that Benchik was "verbally abusive" and had improperly questioned her parenting. [Def. Exs. A-11, P]. Benchik denied those allegations. [Def. Ex. Q].

It was part of Benchik's job to ask probing questions, and it was not uncommon for clients to become upset with those questions. [Benchik Dep. 131:3-132:9; Inman Dep. 32:21-35:4]. A flier posted in the office directed SECs to "stop SNAP fraud" by "ask[ing] probing questions": "If something does not seem right, then ask more questions." [Pl. Ex. 3-A]. A coworker who observed Benchik during a different client interview believed that his interview technique was persistent, but not inappropriately so. [Inman Dep. 35:4-35:22]. Nonetheless, after discussing the incident with Benchik, Former concluded that Benchik had "excessively probed" the mother, and not properly researched the case. Former told Benchik that although a utility bill could be proof of residency, the bills in this case were out-of-date because the family had moved multiple times. Based on her discussion with Benchik, Former concluded that the mother told Benchik the client was homeless due to "physical abuse and mental health issues, [so Benchik] should have left it at that . . . [the mother] never should have been grilled after she explained why the girl was homeless." [Def. Ex. Q].

Benchik was fired the following day, August 29, 2018. [Def. Ex. A-11]. McLeod and Former presented Benchik with his final working test appraisal, and told him he was fired for "not doing your job right," and that he had "no recourse" because he was still in his working test period. The working test appraisal contained Former's summary of the client complaint:

> [Benchik asked the mother] why her daughter was able to use her mailing address, but wasn't able to stay there. [The mother] answered due to her daughter is physically and mentally abusive . . . [The mother] states [Benchik] continued to ask about homeless status even after explanations were given . . . [According to the mother, Benchik] stated she should let her daughter stay there due to she's disabled and when she acts up call the cops . . .

> In all fairness I asked [Benchik] about the conversation and he confirmed he asked her all questions and he did receive those answers, but still didn't believe she was homeless. He stated they [committed] fraud in the past[,] which was untrue . . . [Benchik's] lack of review cause[d] him to miss [exculpatory] information and overprobe.

[Def. Ex. A-10]. The appraisal indicated Benchik "does not meet expectations" in all six competency areas, and that he lacked adequate job knowledge, was "not working effectively" with management, lacked customer service skills, had a "negative attitude" toward certain clients, and failed to timely complete his interviews. *Id.*

Benchik was escorted out by security. Walking past Former's desk on his way out, he said "Tabitha, you're a liar," and Former "jumped at [Benchik] like she wanted to fight [him] or something," while another manager laughed. [Benchik Dep. 139:17-142:8].

**5. HR investigation**

On August 30, the day after his termination, Benchik contacted HR Director Caitlin Floyd to make a complaint of sexual harassment. He told Floyd that he felt he was harassed by Thompson regarding her bathroom use [Floyd Dep. 31:22-32:3], and that he was "getting written up for things that nobody else was written up for." [Benchik Dep. 157:2-18]. Floyd began an investigation and spoke to Benchik, McLeod, and Thompson [Floyd Dep. 32:7-9, 92:6-17], and ultimately prepared an investigative report. The report noted that, according to McLeod's prior investigation, Thompson's bathroom remarks "only happened on a couple of isolated instances." Thompson told Floyd that she only approached Benchik about the bathroom on two occasions, and that Benchik "had replied that this was OK." Ultimately, Floyd concluded that she was "unable to substantiate" Benchik's allegations of sexual harassment. The report did not address Benchik's complaint of unwarranted discipline. [Def. Ex. B-1].

**C.   ANALYSIS**

Defendants seek summary judgment on the remaining claims in this case: Count II ("Title VII Sex Discrimination"), Count IV ("Title VII Retaliation"), and Count V ("Retaliatory

Discharge").[5] Benchik's response brief leaves the Court somewhat unclear as to the intended scope of each claim.[6] The Court interprets Count II as a hostile work environment claim: a claim that, notwithstanding the reasons for Benchik's termination, Defendants subjected him to sex-based harassment that was so pervasive that it altered the conditions of employment and created an abusive work environment. *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015). The Court interprets Count IV as a Title VII retaliation claim, *i.e.*, a claim premised on the allegation that Benchik was disciplined because he complained about discrimination, and Count V as a state law retaliatory discharge claim. [*See* DE 1].

### 1. Adverse/Tangible Employment Action

Before discussing the individual counts, the Court addresses one question that is central to all claims. Generally, to establish a retaliation claim, or employer liability for a supervisor's harassment, the employee must have suffered an "adverse employment action." Adverse employment actions include "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or some other action causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). However, the action must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Traylor v. Brown*, 295 F.3d 783, 788 (7th Cir. 2002). A mere reprimand, or a poor performance review, are not in themselves adverse employment actions. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1119 (7th Cir. 2022); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007).

---

[5] Counts I and III were dismissed by stipulation.

[6] Benchik writes that Count II is "a claim of Sex Discrimination against Defendants, alleging that Defendants . . . deprived him of his rights and privileges afforded to similarly situated employees of another sex or gender." As to Count IV, Benchik writes: "In both and both [sic] Sections of Count IV of Plaintiff's Complaint, he asserts a claim that Defendants retaliated against him for making a complaint about the discrimination, created a hostile work environment and ultimately terminated Plaintiff's employment as a result of the retaliation." [DE 57 at 1-2].

The parties agree that Benchik's termination was an adverse employment action. Benchik generally claims he "was subjected to adverse employment actions during his working test period" [DE 57 at 6], but it is unclear which events he claims constitute a "significant change in benefits." The written counselings he received were not adverse actions, because they were not accompanied by a change in benefits. *Scaife*, 49 F.4th at 1119 ("[A] documented reprimand alone is not an adverse action '[a]bsent some tangible job consequence.'" (quoting *Sweeney v. West*, 149 F.3d 550, 556 (7th Cir. 1998))); *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 602 (7th Cir. 2009) ("[W]ritten reprimands without any changes in the terms or conditions of his employment are not adverse employment actions.").

However, Benchik has presented sufficient evidence to show that the extensions of this working test period were adverse actions. An extension of a probationary period, by itself, is not automatically adverse[7]; however, it can be adverse if it materially affects the terms of employment or results in a denial of benefits. *See Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 n. 21 (7th Cir. 2012); *Smart v. Ball State Univ.*, 89 F.3d 437, 442 (7th Cir. 1996). In this case, the extension of Benchik's working test period meant that he was deprived the right of due process before any suspension or termination.

*Ditty v. Indiana*, No. 1:11-CV-01348-TWP, 2013 WL 1688883 (S.D. Ind. Apr. 17, 2013), is instructive. In that case, the employer's rules subjected probationary employees to harsher disciplinary procedures than permanent employees. The plaintiff, a new employee, made a complaint of sexual harassment the day after her probationary period ended. Three days later, the employer extended her probationary period with retroactive effect. Several months later, while

---

[7] *See, e.g., Zoll v. Northwell Health, Inc.*, No. 16-CV-2063-JMA-AYS, 2019 WL 3554645, at *2 (E.D.N.Y. Aug. 5, 2019), aff'd, 810 F. App'x 79 (2d Cir. 2020); *Gipson v. Cochran*, 90 F. Supp. 3d 1285, 1302-03 (S.D. Ala. 2015); *Smith v. Da Ros*, 777 F. Supp. 2d 340, 355 (D. Conn. 2011).

she was still on probation, she was fired, purportedly for unrelated disciplinary issues. *Id*. at \*2. The Court found that the probation extension "at minimum, subjected her to harsher disciplinary procedures," which raised a question of material fact as to whether the extension was adverse. *Id*. at \*12.

Like the plaintiff in *Ditty*, Benchik was never removed from probationary status. The extensions of probation subjected him to different terms of employment, in the form of a lack of due process before he was fired.[8] This made a material difference for Benchik; he tried to dispute the incident that ultimately led to his termination, but was told he had "no recourse." *C.f. Santiago v. Connecticut*, No. 3:06-CV-277 (RNC), 2008 WL 4453402, at \*5 (D. Conn. Sept. 30, 2008) (finding that an extended working test period was not adverse in part because the plaintiff "successfully passed the extended probationary period"). On these facts, Benchik has raised an issue of material fact as to whether the extensions of his test period were "adverse employment actions" that could support claims based on harassment and retaliation.

### 2.  Count II (Title VII Hostile Work Environment)

The Court now addresses the individual counts, beginning with Count II, stating a claim under Title VII of the Civil Rights Act. Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a violation in the employment context, a plaintiff must show that membership in a protected class "caused the discharge or other adverse employment action." *Purtue v. Wisc. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020). The parties analyze

---

[8] Based on the logic in *Ditty*, it is not relevant that due process was a benefit that Benchik never actually had, as opposed to a right he had that was taken away from him. This is consistent with Seventh Circuit case law indicating that a failure to promote an employee can be an adverse employment action. *See, e.g., Volovsek v. Wisconsin Dep't of Agr., Trade & Consumer Prot.*, 344 F.3d 680, 688 (7th Cir. 2003).

the claims under the framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04 (1973), which provides a method for proving a Title VII claim based on "indirect" evidence of discrimination.[9] However, the Seventh Circuit has emphasized that this is only one way of looking at the available evidence. Ultimately, "the legal standard is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [sex] caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Nigro v. Indiana Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022) ("What matters most is that Nigro show that she 'would have kept h[er] job if [s]he had a different [sex], and everything else had remained the same.'") (citing *Ortiz*); *Reives v. Illinois State Police*, 29 F.4th 887, 892 (7th Cir. 2022).

For his hostile work environment claim specifically, Benchik needs to show: (1) his work environment was both objectively and subjectively offensive; (2) the harassment was based on his sex; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009). Benchik has presented evidence from which a reasonable jury could infer that Defendant IFSSA subjected him to a hostile work environment in the Crown Point office.

As to the first element, the offensiveness of the work environment, conduct is objectively offensive when a reasonable person would find it hostile or abusive. *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1045 (7th Cir. 2002). The offensive conduct "can include employer action based on [sex] but having nothing to do with sexuality." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d

---

[9] Under *McDonnell Douglas*, a plaintiff must establish a prima facie case by showing he (1) belongs to a protected class, (2) was qualified for the job, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees outside of her protected class. The burden shifts to the employer to show a nondiscriminatory reason for the decision, and the plaintiff must ultimately show that the nondiscriminatory reason was pretextual. 411 U.S. 792, 802-04.

781, 788 (7th Cir. 2007) (quoting 3 Lex K. Larson, Employment Discrimination § 46.01[3] (2d ed. 2000)); *see also Passananti v. Cook Cnty.*, 689 F.3d 655, 664-66 (7th Cir. 2012).

Accepting Benchik's allegations as true, for purposes of summary judgment[10]: Thompson made Benchik uncomfortable by repeatedly discussing her bathroom use in graphic terms. Thompson also expressed that "since you're here, there's like 40 women that have to share a bathroom." A reasonable jury could infer that Thompson's comments were hostile or abusive: Thompson sought to make Benchik feel uncomfortable, because his presence was inconvenient for the women who could no longer use the men's room. Thompson's comment to Benchik that "this is how rapes happen," while they were in the restroom together, could support the same inference. Even accepting that Title VII is not "a general civility code," *Faragher*, 524 U.S. at 788 (quotations omitted), Benchik describes an environment that a reasonable jury could find objectively offensive. Benchik's evidence also suggests that the conduct was "subjectively offensive," since he stopped using the employee restrooms because of his discomfort.

---

[10] Defendants argue that Benchik is "not entitled to his version of the events" at the summary judgment stage, because his testimony "cut against a lot of the allegations he asserts in his response brief." [DE 62 at 5]. Defendants state, without citation to legal authority, that Benchik "cannot choose to ignore other evidence cited and just rely on his own allegations when there are other documents as part of the record that do not describe his allegations in the same manner." *Id.* They point out that Benchik's response attached a transcript of Thompson's testimony before a state administrative agency, in which she denied making harassing remarks about the bathroom.

The fact that a witness disagrees with Benchik, and her disagreement is "part of the record," does not foreclose Benchik from making a contrary allegation. Benchik's response to Defendants' statement of material facts makes clear that he disputes Thompson's testimony about the bathroom remarks. [See DE 58 ¶ 54]. At least one other IFSSA employee believed Benchik had been discriminated against. [*See* Pl. Ex. 11]. Although there are other IFSSA employees who agree with Thompson, Benchik's story is not so "blatantly contradicted by the record" that it can be ignored at summary judgment. *Cf. Scott v. Harris*, 550 U.S. 372, 380 (2007) (plaintiff's statement that he was not speeding could not be accepted, where it was directly contradicted by a videotape showing a "Hollywood-style car chase"); *see also Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018) ("The plaintiffs cited to deposition testimony and sworn declarations in which the plaintiffs testified that they heard [abusive] language. Nothing more is required on summary judgment.").

Although the comments were not sexual in nature, it is reasonable to infer that they were "based on sex[11]," in that Benchik was targeted because he used the men's room. Sex or gender-based actions that make an employee's bathroom use uncomfortable can sustain a Title VII claim. *See, e.g., Doe v. Triangle Doughnuts, LLC*, 472 F. Supp. 3d 115, 129 (E.D. Pa. 2020) (denial of the women's bathroom to transgender plaintiff supported a hostile work environment claim); *United States v. City of Houston, Texas*, No. CV H-18-0644, 2020 WL 2516603, at *26-27 (S.D. Tex. May 15, 2020) (unsanitary conditions in the women's bathroom could establish harassment based on sex). In the context of Crown Point's bathroom setup, a jury could reasonably infer that Thompson's comments reflected hostility against Benchik because he was using the separate bathroom, rather than generically "juvenile behavior," which would not sustain a Title VII claim. *Brown v. Advocate S. Suburban Hosp.*, 700 F.3d 1101, 1105 (7th Cir. 2012).

Benchik has also presented evidence that the conduct was "severe or pervasive." Conduct is sufficiently severe or pervasive when it "alter[s] the conditions of the victim's employment and create[s] an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). Courts consider factors such as (1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening as opposed to verbally abusive; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it is directed at the victim. *Scaife v. United States Dep't of Veterans Affs.*, 49 F.4th 1109, 1116 (7th Cir. 2022). The behavior does not need to make the workplace "hellish," *Jackson v. Cty. of Racine*, 474 F.3d 493, 500 (7th Cir. 2007), but it must go

---

[11] The Court, like the parties, refers to Benchik's claims as sex discrimination claims, although much of the alleged discrimination could be described as gender-based. Under Title VII, the term "sex" is understood to include both biological sex and gender. *See Hively v. Ivy Tech Cmty. Coll. of Indiana*, 853 F.3d 339, 342 (7th Cir. 2017) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)).

beyond "the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788 (citing B. Lindemann & D. Kadue, Sexual Harassment in Employment Law 175 (1992)). Whether harassment is sufficiently severe or pervasive is generally a question of fact for the jury. *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 901 (7th Cir. 2018).

The alleged frequency of Thompson's bathroom remarks – every day, sometimes multiple times a day, for six months – weighs heavily in Benchik's favor. *Jackson*, 474 F.3d at 499 (offensive comments were not "'isolated incidents,' when the plaintiffs' deposition testimony asserts that [a co-worker] engaged in this type of behavior on a daily basis"); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) ("A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage."). Thompson made these comments directly to Benchik, and she was Benchik's immediate supervisor at the time, which makes her comments more impactful than those of another co-worker. *Scaife*, 49 F.4th at 1116-17 ("a harasser who has direct supervisory control [carries] more weight in the analysis" than a peer or an indirect supervisor); *Robinson v. Perales*, 894 F.3d 818, 829 (7th Cir. 2018) ("[L]anguage not directed at the plaintiff is not as great as the impact of language that is so directed.").

There are factors weighing in Defendants' favor. Thompson's comments were not, on their face, "physically threatening or humiliating," and there is no evidence they directly interfered with Benchik's work performance. However, Benchik's evidence could support a reasonable inference that they changed the terms of his employment. Assuming all facts and inferences in Benchik's favor, he was working under inferior conditions from other employees, using a public restroom because of abuse he was receiving from his supervisor. Although

Benchik's choice of restroom could be seen as trivial, a reasonable jury could see it as the product of a broader effort by Thompson to create a hostile work environment based on his sex.

Defendants argue that IFSSA should not be liable for any hostile work environment created by Thompson. "When a supervisor is the harasser, the employer is strictly liable for his or her conduct, subject to any affirmative defenses that may preclude its liability." *McPherson v. City of Waukegan*, 379 F.3d 430, 439 (7th Cir. 2004). Generally, the harassment must "culminate[] in" a tangible employment action. *Burlington Industries Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher*, 524 U.S. at 807. The rationale for this rule is that most tangible employment actions can only be imposed by "a person acting with the authority of the company," so an employer cannot avoid liability merely because one particular supervisor took an adverse action against an employee. *See Burlington*, 524 U.S. at 762.

Seventh Circuit case law indicates that for these purposes, a "tangible" employment action is equivalent to an "adverse" employment action. *See Murray v. Chicago Transit Auth.*, 252 F.3d 880, 888 (7th Cir. 2001); *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999) ("[A] tangible employment action is akin to an adverse employment action, as courts have used the term."). As described above, Benchik has raised a material issue as to whether the extension of his working test period was an adverse employment action. Thompson, for her part, prepared the "request" to upper management to extend Benchik's test period. Even if the final decision is attributed to Thompson, rather than IFSSA, she acted with the supervisory authority granted by her employer.[12] Therefore, IFSSA is liable for any hostile environment allegedly created by

---

[12] *Kibbons v. Taft Sch. Dist. 90*, 563 F. Supp. 3d 798, 809 (N.D. Ill. 2021) ("A supervisor need not be able to unilaterally effect a tangible employment action; it can be enough to conduct evaluations that may lead to increases in salary or "initiate[ ] firing and suspending personnel," even if approval from higher management is required.") (quoting *Vance v. Ball State Univ.*, 570 U.S. 421, 437 n. 8 (2013)); *c.f. Johnson v. West*, 218 F.3d 725, 731 (7th Cir. 2000) ("Williams's actions created a hostile working environment for Johnson, but he himself did not use his supervisory authority to get her fired.").

Thompson, and IFSSA's affirmative defense – based on the premise that Thompson's harassment did not culminate in a tangible employment action – does not entitle it to summary judgment.

### 3. Count IV (Title VII Retaliation)

As with hostile work environment claims, the Seventh Circuit has recognized both a "direct" and "indirect" method of proof for Title VII retaliation claims. Under the direct method, Benchik must prove that (1) he engaged in an activity protected by the statute; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018). Under the indirect method, he must show that (1) he was a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) the employer treated a similarly situated person outside the protected class more favorably. *Poullard v. McDonald*, 829 F.3d 844, 854 (7th Cir. 2016). "Whether we apply th[ese] method[s] formally or just cut to the chase and ask the fundamental question directly—could a reasonable trier of fact infer retaliation?—makes no difference." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015).

The Court finds that, under any method, Benchik has failed to raise a reasonable issue of fact as to retaliation. Benchik alleges that, during his working test period, Thompson was making remarks about the bathroom every day for six months. During that time, he did not complain to anyone about the harassment. On the day after the test period ended, he told Thompson: "Kim, you've got to stop this. You can't keep asking me about the bathroom, it's illegal. You can't do this," to which Thompson replied "Okay." Later that day, Thompson began the process of extending Benchik's test period. While the extension of the test period was an adverse

employment action that allows his hostile work environment claim to proceed, Benchik has not shown that the test period was extended *because* he complained about harassment.

Benchik seeks to draw an inference from the timing of Thompson's request to extend the test period, allegedly 20 minutes after Benchik's complaint to Thompson. "Suspicious timing, together with other facts, can sometimes raise an inference of a causal connection." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 772 (7th Cir. 2008). However, "mere temporal proximity . . . will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). When an employee has already been disciplined, that "largely precludes any inference of retaliation based only on suspicious timing." *Jones v. Alpha Rae Pers., Inc.*, 903 F. Supp. 2d 680, 688 (N.D. Ind. 2012) (citing *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005)) (parenthetical omitted).

By the time he complained about the harassment, Benchik had received three written counselings[13] against him, and had already told another supervisor that he had not been able to keep up with the training. Benchik devotes much of his brief to arguing that his training was inadequate, and he was disciplined too harshly during his training period. That may be true, but those facts do not support an inference of retaliation, because they happened before Benchik made his complaint to Thompson. *Leonard v. E. Illinois Univ.*, 606 F.3d 428, 432 (7th Cir. 2010) ("The order of events is even more important than the time between them; the theory doesn't work if the retaliatory act precedes the protected activity.").

---

[13] Benchik makes much of the fact that Thompson gave him written counselings instead of warnings, casting this as an example of Thompson's animus against him. But the undisputed facts show that it was McLeod, the (male) regional manager, who directed Thompson to "reduce the communication to writing" with Benchik after the Facebook incident. In light of that fact, the decision to give him written counselings, rather than the warnings more typically given to trainees, does not support an inference of animus or discrimination.

Benchik's complaint to Thompson was as follows: "Kim, you've got to stop this. You can't keep asking me about the bathroom, it's illegal. You can't do this," to which Thompson replied "Okay." Thompson's bathroom remarks ended soon after, and this exchange does not demonstrate animus[14] from Thompson or resistance to Benchik's request. *Cf. Magyar*, 544 F.3d at 773 (finding an inference of retaliation based on suspicious timing and the supervisor's "defensive and accusatory" statements: "[S]he comes across as having a substantial problem with [the employee's complaint]."). And the "suspicious timing" cuts both ways – Benchik had just finished his first six months, and was overdue for his performance review, so it was not surprising that Thompson prepared it after she spoke to him. It is reasonable to infer a link between the conversation with Benchik and the *timing* of the review. But Benchik provides no reason – other than his own speculation – to infer that the conversation dictated the *content* of the review.

Benchik points out that IFSSA did not follow its own policies in extending the test period, because the review should have come before the end of the test period, and he did not receive a copy of the review in a timely manner. "Significant, unexplained or systematic deviations from established policies or practices can no doubt be relative and probative circumstantial evidence of discriminatory intent." *Hanners v. Trent*, 674 F.3d 683, 694 (7th Cir. 2012). However, merely identifying a procedural error is not enough; the error must invite an inference of discrimination. *See Smith v. Chicago Transit Auth.*, 806 F.3d 900, 907 (7th Cir. 2015) ("Smith hasn't explained why these [procedural] infirmities . . . support an inference of

---

[14] Benchik also infers animus and discrimination from the fact that from his other manager, Tabitha Former, "reprimanded" him for client interviews that spilled into his lunch period, but the supervisor's remark does not seem to have been disciplinary in nature: "Jonathan, please don't shorten your lunches. It's illegal for us to allow you to do so. You're entitled to an hour. You will get faster, but just make sure you're taking control of all calls." However, his final review indicated that his interview speed "[did] not meet expectations" due to "poor call control, lack of knowledge, and failure to use tools provided." [Def. Ex. 11].

discriminatory intent"). Defendants do not explain why the review was late, but Benchik does not explain why a review submitted a day late (and finalized a week later) is suggestive of discrimination, rather than error or laxity.[15] "[W]e look for pretext in the form of a dishonest explanation, a lie rather than an oddity or an error." *Golston v. Ford Motor Co.*, No. 18-CV-02844, 2021 WL 4477859, at *8 (N.D. Ill. Sept. 30, 2021) (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 969 (7th Cir. 2012)).

An inference of retaliation would contradict the reasonable explanations for Thompson's decision. It was "common" for SECs to have their trial periods extended, because the training takes so long that the managers are not able to assess the employees' competence after six months. Thompson suggested as much in her initial recommendation: "Jonathan does not possess adequate SEC job knowledge due to only completing ES training recently." Beyond that, there was evidence that Benchik was struggling to keep up with the training, and he had already been disciplined for other reasons. *See Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 926 (7th Cir. 2019) ("[B]y the time [management] learned of her complaints, there were already four months of documented performance issues on her record."); *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 676 (7th Cir. 2011) ("Although a retaliation claim can be supported by evidence of sudden dissatisfaction with an employee's performance . . . the evidence in this case belies that characterization. [The supervisors] both considered her behavior to be problematic before the meeting.") (citations omitted).

---

[15] To the extent Benchik argues the delay was itself was an adverse employment action, he has not shown how that caused a "significant chance in benefits," especially since the discrepancy was resolved within a week. *See, e.g.*, *Gustin v. Schneider Corp.*, No. 1:09-CV-1452-TWP, 2011 WL 1486007, at *5 (S.D. Ind. Apr. 19, 2011) (employee's untimely review was not adverse, despite "speculative" assertion that it led to denial of a raise); *Harroun v. S. Wine & Spirits of Illinois, Inc.*, No. 09 C 2522, 2010 WL 3420062, at *6 (N.D. Ill. Aug. 23, 2010) (two-month delay for employee evaluation was not adverse). Nor has Benchik shown that the deviation from policy was retaliatory; it was not caused by his harassment complaint, since the review was already overdue at that point.

Benchik believes he was performing better than the discipline and performance records suggested, and any perceived problems were IFSSA's fault. But poor management, or misguided evaluation of an employee, does not give rise to a retaliation claim. "An employer's reasons for firing an employee can be 'foolish or trivial or even baseless,' as long as they are 'honestly believed.'" *Lord v. High Voltage Software*, Inc., 839 F.3d 556, 564 (7th Cir. 2016) (citations omitted). IFSSA may have treated Benchik harshly, or even unfairly, but what is missing is evidence that it did so *because* he asked Thompson to stop making remarks about the bathroom.

Nor has Benchik raised a reasonable inference that subsequent adverse actions – the second extension of his probation period, and his termination – were retaliatory. By this point, Thompson was no longer making any bathroom remarks[16], Benchik had been reassigned to a new supervisor, and he had been moved to the Hammond office[17], where there were no apparent bathroom issues. Thompson completed his next performance review, instead of the new supervisor, but Thompson was the one who had supervised Benchik for almost all of the time period under review. As with Benchik's complaints about the written counselings: even if we

---

[16] Benchik asserts that after he met with McLeod in May 2018 and told him directly about his difficulties with Thompson, McLeod failed to submit a written complaint to Human Resources and failed to "conduct[] an investigation consistent with the policies and procedures of the State." [DE 57 at 8 citing Pl. Ex. 6 (Deposition of Teresa Stuckey)]. The exhibit relied on for that statement is missing one of the cited pages, and does not clearly show how McLeod's investigation deviated from "the policies and procedures of the State." To the extent the Court can discern: the deponent testified that complaints of discrimination and harassment would be referred to the appropriate "agency head or designee," who could investigate on their own, although they would "typically" seek help from an HR representative. As for the written report, "[t]here is an investigation report format available to [managers], so they could follow that," but they were not required to. [Pl. Ex. 6, 19:1-20:25]. Any discrepancy on this point does not affect the outcome of the motion.

[17] Benchik alleges that McLeod transferred him to Hammond knowing that "it was not feasible to provide mentoring and training that [Benchik] had requested due to [] Thompson's deliberate failure to provide same." [DE 57 at 10 (citing Pl. Ex. 12)]. The cited exhibit indicates that Former told McLeod that she would have to modify her training because she was taking on four new trainees. McLeod acknowledged this, but said that the transfer was justified by the "[o]perational needs" of all the offices in the region. [Pl. Ex. 12]. This cuts against any inference that Benchik was transferred to Hammond to intentionally deprive him of training or to retaliate against him for making a complaint of harassment.

concede that he was treated unfairly[18], he has not presented facts showing that he was disciplined because he made a complaint.

The incident leading to Benchik's termination demonstrates the point. In her final review of Benchik, Tabitha Former (his new supervisor) found that he had excessively questioned a client about the fact that her daughter was homeless, despite being told that this arose from a domestic abuse situation. Benchik believed that the family had committed fraud in the past, which undermined their story, but Former concluded from her review that there had been no fraud and that Benchik should have drawn the same conclusion. Fair or not, this was consistent with other observations the managers had made about Benchik: that he was not reviewing the cases thoroughly enough, not following his managers' directives, and handling his interviews poorly. "[T]he consistency between [his prior] performance evaluation and the negative reports that followed [his] sexual harassment complaint undermines the reasonableness of any inference that the latter reports were not genuine." *Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008).[19]

### 4. Count V (State Law Retaliatory Discharge)

Benchik also pleads a claim for retaliatory discharge under Indiana law. Indiana recognizes a claim for an at-will employee who is terminated for taking certain actions, such as

---

[18] Benchik asserts that he should have been "offered progressive discipline measures . . . as required in the Performance Management Policy Manual," [DE 57 at 12], but he does not refer to the manual as evidence, nor present any other evidence that the manual required that in Benchik's case. The closest he comes is his reference to the testimony of co-worker Lanetta Inman, who testified generally that there was some form of progressive discipline for SECs. [*See* DE 58, ¶¶ 71, 83; Pl. Ex. 3, 15:16-16:19]. Benchik's unsupported assertion about the contents of the manual does not create a genuine issue of material fact. *See* N. D. Ind. L. R. 56-1(b)(1) (the non-moving party must identify, file, and serve "any materials that the party contends raise a genuine dispute") (as amended November 18, 2019).

[19] Benchik points out that when Former handed him his second performance appraisal, she told him "not to worry" and that he was "doing fine." Given Benchik's disciplinary record, and the circumstances of the later client complaint, no reasonable juror could infer from that comment that Former's final performance review was pretextual. *C.f. Lang v. Illinois Dep't of Child. & Fam. Servs.*, 361 F.3d 416, 419-20 (7th Cir. 2004) (employee raised an inference of retaliation where he had "a five-year record of positive performance reviews," then received three disciplinary incidents, which "proved to be baseless and [were] removed from his record after a hearing").

making a worker's compensation claim. *See Perkins v. Mem'l Hosp. of S. Bend*, 141 N.E.3d 1231, 1238 (Ind. 2020). Defendants have cited case law indicating that Indiana law does not recognize a claim for wrongful discharge where there is a statutory remedy, such as Title VII, available. *See*, *e.g.*, *Davenport v. Indiana Masonic Home Found. Inc.*, No. IP00-1047-C-H/G, 2004 WL 2278754, at *4 (S.D. Ind. Sept. 30, 2004). Benchik has not addressed this argument for dismissal. Regardless, the Court does not need to resolve this question, because the evidence demonstrates that Benchik was terminated based on IFSSA's genuine belief that he was performing poorly, not because of retaliation. Accordingly, Count V will be dismissed.

### 5. Defendant Jennifer Sullivan/Punitive Damages

In addition to IFSSA, Benchik sued Jennifer Sullivan, the former secretary of IFSSA, in her official capacity. [DE 1, p. 1]. As Defendants point out, a lawsuit against an employee in her official capacity is generally equivalent to a lawsuit against the employer itself. *Kentucky v. Graham*, 473 U.S. 159, 166, (1985) ("An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity . . . for the real party in interest is the entity."). Because the employer itself is a defendant, Defendants argue that the claim against Sullivan is redundant. Benchik has not responded to this argument. Accordingly, summary judgment will be granted on all claims as to Sullivan. Finally, while Benchik seeks punitive damages under Title VII, "Title VII does not allow for the recovery of punitive damages against a "government, government agency, or political subdivision." *Taleyarkhan v. Purdue Univ.*, 837 F. Supp. 2d 965, 970 (N.D. Ind. 2011) (quoting 42 U.S.C. § 1981a(b)(1)). Benchik has not responded to Defendants' argument on this point. Therefore, summary judgment will be granted as to Benchik's claims for punitive damages under Title VII.

**D.     CONCLUSION**

For the reasons described herein, the Court **GRANTS in part** Defendants' motion for summary judgment [DE 49].

- Counts IV and V are dismissed in their entirety;

- Count II is dismissed as to Defendant Jennifer Sullivan;

- The punitive damage claims listed in Count II are dismissed;

- Count II remains pending against Defendant IFSSA.

The parties are **ORDERED** to file a joint report by **February 14, 2023**, identifying a date by which they would be ready for trial, and addressing the status of any mediation or settlement discussions.

So ORDERED this 31st day of January, 2023.

s/ Joshua P. Kolar
MAGISTRATE JUDGE JOSHUA P. KOLAR
UNITED STATES DISTRICT COURT